**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HELEN FUREY,<br>1111 19th Street, North, Apt. 1505<br>Arlington, VA 22209,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN T. MNUCHIN, SECRETARY,<br>U.S. DEPARTMENT  OF THE TREASURY,<br>1500 Pennsylvania Avenue, NW<br>Washington, DC 20220,<br><br>Defendant. | Civil No. 17-1851<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

**COMES NOW,** Plaintiff HELEN FUREY, by her undersigned counsel, and complains of Defendant STEVEN T. MNUCHIN, in his capacity as Secretary, U.S. Department of the Treasury, as follows:

## NATURE OF THE CASE

1. This is an action to recover damages for Defendant's unlawful discrimination and hostile work environment on the basis of age, in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"), and on the bases of national origin, race, and reprisal for protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII").

2. Plaintiff further alleges that her removal was not supported by substantial evidence, and that she was unlawfully removed for allegedly deficient performance in a detail, rather than in her position of record, in violation of 5 U.S.C. § 4303.  Pursuant to 5 U.S.C. § 4303, a federal

agency may remove an employee for unsuccessful performance.  However, an employee may not be removed for unsuccessful performance in a detail.  Plaintiff's position of record was an IT Specialist in the Department Offices ("DO") Operations division of the Office of the Chief Information Officer ("OCIO").  Since she began working for Defendant in 2010, Plaintiff consistently received successful performance ratings.  In or around August 2013, Plaintiff was detailed to an IT Specialist position in Enterprise Content Management ("ECM").  During her detail, Plaintiff had a different supervisor, a different performance plan, and different job duties.

3.   Although Plaintiff had the same position description for her ECM detail, she had a different performance plan

## JURISDICTION AND VENUE

4.   This Court has jurisdiction over the claims pursuant to 29 U.S.C. § 633a and 42 U.S.C. § 2000e-5.  Further, Defendant formerly employed Plaintiff in the District of Columbia ("DC"), and the alleged unlawful acts took place here.

5.   Venue is proper because Defendant formerly employed Plaintiff in DC.

## THE PARTIES

6.   During the relevant time period, Plaintiff was Defendant's employee within the meaning of the ADEA and Title VII.

7.   Defendant Mnuchin is named in his official capacity as Secretary of the U.S. Department of the Treasury.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.   Plaintiff exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.

9.   Plaintiff filed a formal discrimination complaint with Defendant on October 20, 2014.

10. On May 12, 2015, more than 180 days after filing her formal complaint, Plaintiff requested a hearing before a U.S. Equal Employment Opportunity Commission ("EEOC") administrative judge ("AJ").

11. Before Plaintiff's case was assigned to an EEOC AJ, Defendant removed Plaintiff from her employment.  Plaintiff timely filed a mixed case appeal with the U.S. Merit Systems Protection Board ("MSPB") on July 16, 2015.

12. Plaintiff withdrew her request for a hearing and, instead, requested that the MSPB AJ issue a decision based on the written record.

13. On February 2, 2017, MSPB AJ Sarah P. Clement issued the Initial Decision, affirming Plaintiff's removal and rejecting Plaintiff's affirmative defenses of discrimination and retaliation.  The Initial Decision became final on March 9, 2017.

14. On April 3, 2017, Plaintiff timely filed a Petition for Consideration of MSPB Decision with the EEOC Office of Federal Operations ("OFO").

15. On August 10, 2017, the OFO issued a decision, concurring with the MSPB's Final Decision that Plaintiff was not subjected to unlawful discrimination or reprisal.  The OFO's decision further advised Plaintiff of her right to file the instant action within 30 calendar days.

## FACTS

16. At the beginning of the relevant time period, Plaintiff was 50 years old.  Her race is Asian, and her national origin is Chinese.  Although Plaintiff is fluent in English, she is not a native English speaker.

17. At all times relevant to this Complaint, Defendant was aware of Plaintiff's age, race, and national origin, based on Plaintiff's physical appearance, accent, documentation in her official personnel file, and Plaintiff's comments.

18. Plaintiff began working for Defendant on January 31, 2010.  She was hired as an IT Specialist, GS-14 in the Department Offices ("DO") Operations division of the Office of the Chief Information Officer ("OCIO").

19. Plaintiff consistently received satisfactory ratings on her annual performance evaluations, and she had no history of discipline.

### *Defendant detailed Plaintiff to Enterprise Content Management.*

20. In or around August 2013, Plaintiff was detailed to an IT Specialist position in Enterprise Content Management ("ECM").

21. Although Plaintiff had the same position description for her ECM detail, she had a different performance plan.  She received her performance plan for the detail in or around March 2014.

22. Plaintiff was one of four project managers ("PMs") in ECM.  The other PMs were Bill Marcinko (30s, white/Caucasian, American, native English speaker), Camille Smith (30s, black/African American, American, native English speaker), and Sean Fox (30s, white/Caucasian, American, native English speaker).

23. Plaintiff's first-line supervisor was ECM IT Program Manager James Graham (50s; white/Caucasian; American of Scottish, Irish, German, Cuban, and Scandinavian descent; native English speaker).

24. Plaintiff's second-line supervisor was Director of Applications, ECM and Web Solutions, Chief Information Officer Chakravarthy Susarla (50s, Asian, Indian).

### *Plaintiff was excluded from meetings and team workspace and denied telework and training.*

25. On numerous occasions, Graham did not show up to his scheduled one-on-one meetings with Plaintiff.  He did not typically miss meetings with the other PMs.

26. Graham and Marcinko regularly excluded Plaintiff from project meetings.  For example, in or

around April 2014, Marcinko, Plaintiff, and a contractor met with a customer.  Marcinko left the meeting to discuss an issue with Graham.  A few minutes later, Graham asked the contractor, but not Plaintiff, to come to his office, too.  Plaintiff concluded the meeting and went to Graham's office.  Graham was in his office with Marcinko and the contractor, and would not let Plaintiff in the office.

27. Beginning in or around March 2014, Graham met with Marcinko, Smith, and Fox for "ECM Sync" meetings every Monday and Thursday.  ECM Sync Meetings were intended to provide an opportunity for Graham and the PMs to discuss the status of ECM projects.  Plaintiff was the only PM who was excluded from the meetings.  Graham did not invite Plaintiff to the ECM Sync meetings until on or about October 6, 2014, the same day he learned that Plaintiff had filed an EEO complaint.

28. Graham rescheduled ECM Sync meetings to accommodate Smith's alternative work schedule ("AWS") day, but he did not extend this courtesy to Plaintiff.

29. If Plaintiff wanted to telework, Graham required her to submit a list of the assignments she planned to do and show that she would be performing nine hours of work from home.  Graham did not require Marcinko, Smith, or Fox to request permission to telework or send him a list of assignments.

30. Graham also refused Plaintiff's requests for training.  For example, Graham denied Plaintiff request's to take SharePoint and WebTrends training.  However, he did not deny the other PMs' requests for training.

31. Additionally, all ECM employees had workspace on the 13th floor except for Plaintiff, who was on the 11th floor.  Marcinko and Smith were hired after Plaintiff began her detail, but they were given office space on the 13th floor.

*Graham placed Plaintiff on a Performance Improvement Plan.*

32. On August 27, 2014, while Plaintiff was on a detail to ECM, Graham placed her on a Performance Improvement Plan ("PIP").  He had never previously indicated that Plaintiff's performance was unsatisfactory or that she was otherwise in danger of being placed on a PIP.

33. Graham claimed that he had previously discussed with Plaintiff the litany of alleged performance deficiencies listed in the PIP.  However, he had only ever expressed concern about the Treasury FISMA Information Management System ("TFIMS") project.

34. The PIP stated that Plaintiff was removed from the TFIMS project because she failed to properly manage it and did not keep Graham informed about project status.  On the contrary, Plaintiff kept Graham apprised of project status through weekly status reports and other emails.  Further, Graham and Marcinko hindered Plaintiff's ability to manage the project by intentionally excluding Plaintiff from TFIMS project meetings.

35. Additionally, the PIP alleged that Plaintiff failed to meet project percentage progress goals that Graham discussed with her at her mid-year assessment meeting on June 11, 2014. This is also untrue.  Defendant's computerized system showed that Graham changed Plaintiff's progress goals on June 12, 2014.  Therefore, it was impossible for Graham to have discussed the goals with Plaintiff on June 11, 2014.

36. To demonstrate successful performance during the PIP, Plaintiff was required to perform numerous assignments, in addition to her regular duties.

37. To demonstrate successful performance in Critical Element 1, Communication, Plaintiff was required to submit weekly activity reports ("WARs"); submit weekly project status reports for the contractor on-boarding process, the project ECM Metrics Dashboard, and EPMLive; and give a presentation on the ECM Metric Dashboard at the EBS all hands and PM meetings.

38. To demonstrate successful performance in Critical Element 3, Teamwork, Plaintiff was

required to attend "twice weekly" ECM PM meetings and take notes that identified action items and organized project status by urgency, and provide hands-on support to other ECM PMs at "twice weekly" ECM PM meetings.

39. To demonstrate successful performance in Critical Element 4, Technical Competency, Plaintiff was required to submit reports on SharePoint 2013 Business Intelligence ("BI") and WebTrends.

40. To demonstrate successful performance in Critical Element 5, Expand Shared Service Offerings, Plaintiff was required to submit a SharePoint 2013 code solution that included setting up a developer Virtual Machine ("VM") with SharePoint 2013, converting a SharePoint 2010 site to SharePoint 2013, and modifying the SharePoint 2010 solution code to 2013.

41. To demonstrate successful performance in Critical Element 6, Improve, Support and Maintain OCIO/EBS Program Operations, Plaintiff was required to develop the ECM Metric Dashboard using ECM software languages and SCRUM agile development methodology, and use the ECM Change Control Board ("CCB") process to promote code through the ECM life cycle.

42. Graham later told Plaintiff that he based the PIP on the job duties and qualifications of a GS-13 SharePoint developer.  This made no sense because Plaintiff was a GS-14 IT Specialist.

*Plaintiff engaged in protected EEO activity.*

43. Plaintiff contacted an EEO counselor on September 22, 2014, alleging that Graham discriminated against her on the basis of her age, race, and national origin.

44. Graham and Susarla became aware of Plaintiff's EEO activity on or about October 6, 2015.

45. On October 8, 2014, Graham emailed his second-level supervisor Debra Vess and Susarla, detailing his conversation with the EEO counselor assigned to Plaintiff's case.

46. Plaintiff filed a formal EEO complaint on October 20, 2014.

47. Graham submitted his initial affidavit to the EEO investigator on December 12, 2014.

48. Plaintiff amended her EEO complaint to add a claim alleging that Graham and Susarla retaliated against her for EEO activity.

49. Graham submitted a supplemental affidavit (relating to the new claim) to the EEO investigator on March 23, 2015.  Susarla submitted his affidavit to the EEO investigator in or around the end of March of the beginning of April 2015.

### *Defendant failed to assist Plaintiff during the PIP.*

50. On October 22, 2014, approximately two weeks after learning about Plaintiff's EEO activity, Graham emailed Plaintiff, stating that she was at risk of not completing the PIP assignments.

51. After Plaintiff contacted EEO, Graham refused to provide her with assistance in improving her performance.  He did not meet with her at least once every two weeks, and the meetings they did have were shorter than 30 minutes.  During those meetings, Graham did not discuss project status and expectations in any degree of detail.

52. Graham further impeded Plaintiff's progress by denying her training and access to software, and by refusing to respond to her requests for approval for VM installation, which was a prerequisite to the PIP assignments for Critical Elements 5 and 6.

### *Graham proposed to remove Plaintiff.*

53. On March 23, 2015, the same day he submitted his supplemental affidavit to the EEO investigator, Graham proposed to remove Plaintiff for unsuccessful performance in five critical elements.  Susarla was named as the deciding official.

### *Plaintiff demonstrated successful performance in Critical Element 1.*

54. During the PIP, Plaintiff submitted the required weekly activities reports and weekly onboarding status reports.  She performed project management activities and updated project

status in EPMLive by entering accomplishments, milestones, costs, risks, mitigation, resource distribution, and project scheduling events. All of those metrics were in the EBS template.

55. Plaintiff could not complete the ECM Metrics Dashboard tasks because Graham did not provide any instructions or guidance. For example, the PIP stated that details relevant to the ECM Metrics Dashboard project were outlined in the Critical Element 5 section, which did not contain any such details or instructions.

*Plaintiff demonstrated successful performance in Critical Element 3.*

56. Contrary to Graham's statements, ECM PM status meetings (*i.e.*, ECM Sync meetings) were only held on Mondays (*i.e.*, not twice per week). However, Plaintiff's assigned AWS day was every other Monday. Therefore, she could only attend the ECM PM meeting every other week. Plaintiff attended every ECM PM meeting that was not an AWS day or that was not cancelled. Although Graham changed the schedule to accommodate Smith's AWS day, he would not change the schedule to allow Plaintiff to attend each meeting.

57. At the first ECM PM meeting Plaintiff attended, on October 6, 2014, she took meeting notes and prioritized project status. Afterward, she followed-up on action items and sent her teammates the notes. She did the same for the second ECM PM meeting on October 20, 2014. During the third meeting, on November 3, 2014, Graham told Plaintiff she did not need to continue taking notes.

58. Graham did not discuss hands-on support for Executive Clearance Tracker, TEOAF, or SharePoint 2013, and EPMLive at PIP meetings. Plaintiff offered to provide hands-on support to the other PMs, who declined to accept her assistance.

59. Further, SharePoint 2013 was not ready for testing during the PIP, so she could not provide hands-on support at that time. Although Graham told Plaintiff she was no longer required to

work on PIP projects, she assisted with the testing.  She also provided support for other projects whenever needed or requested.  For example, she created six project websites and one requisitions website on the ECM COE SharePoint Dashboard.

60. Plaintiff performed EPMLive project management activities and maintained the project management tracking system to reflect accomplishments, milestones, costs, risks, mitigation, resource distribution, and project scheduling events.

61. In addition, during a meeting on October 9, 2014, Susarla and Tim Womack instructed Plaintiff to establish an Internal Defendant Agreement ("IAA") with her customer for a task order.  Consequently, Plaintiff created an additional project in EPMLive for that task order, which was a part of ILS.  She specifically indicated that the data migration project was a part of the ILS work and was created as required by the EBS IAA process.  Plaintiff explained this to Graham and offered to delete the project.  He told her to leave it as is.  Before issuing the proposed removal, he never indicated that Plaintiff had failed to follow standards or that the application had any negative impact.

*Plaintiff demonstrated successful performance in Critical Element 4.*

62. Graham did not provide Plaintiff with access to SharePoint 2013 BI software during the PIP.  Nonetheless, she timely submitted the SharePoint 2013 BI report on December 22, 2014.  In her report, she noted that she used information from external sources because she did not have access to the software itself.

63. In order to write the WebTrends report, Plaintiff needed to know about ECM requirements, products, services, customers, and the ECM Clearance Tracker application.  Graham provided minimal information about these factors.  This assignment was not related to a critical element of Plaintiff's performance because she does not use this type of technical expertise to perform

her actual job duties.   Moreover, Graham denied Plaintiff's requests for SharePoint and WebTrends training.

*Plaintiff demonstrated successful performance in Critical Elements 5 and 6.*

64. The assignments for Critical Elements 5 and 6 were dependent upon successful VM installation.  Graham intentionally prevented Plaintiff from completing the assignments by providing inaccurate guidance and failing to timely approve VM installation.

65. Pursuant to Graham's instructions, Plaintiff contacted Infrastructure and Operations ("IO") to set up the VM.  After speaking with IO employees, Plaintiff informed Graham that her computer could not use VM because it did not have enough RAM.  On November 17, 2014, Graham told Plaintiff, for the first time, that she was supposed to set up the VM in the cloud environment.  However, IO could not access the cloud.  In other words, it was impossible to set up the VM according to Graham's instructions.

66. Graham attempted to cover up his mistakes by accusing Plaintiff of not understanding VM and of violating Defendant cyber security policies by trying to install the VM on her computer, rather than on the cloud.  She did not violate Defendant policy; the ECM/Web Helpdesk suggested that she install the VM on her computer.

67. Graham further prevented Plaintiff from performing the PIP tasks by refusing to approve the VM installation.  All Graham had to do to indicate his "approval" was to send an email confirming that he approved of installation.

68. On December 1, 2014, Fox asked Graham for approval to set up Plaintiff's VM.  Graham did not respond.  Plaintiff again asked for approval on December 3, 2014.

69. Graham did not approve Plaintiff's VM installation until approximately one month later.  Consequently, the VM was not set up until January 2, 2015, after the PIP ended.  All Graham

had to do was send an email stating he approved installation.

70. Graham's inaccurate instructions and refusal to approve installation also prevented Plaintiff from completing other projects.  For example, the PIP instructed Plaintiff to develop an"ECM Metric Dashboard" in the VM environment.  However, Graham later claimed that Plaintiff was to develop the "ECM Customer Management Dashboard," which was not identified in the PIP.  Ultimately, she created an ECM Customer Management Dashboard template website with a sample SCRUM project plan in an existing ECM production environment, in order to compensate for not having access to the VM development environment.

### *Defendant supplemented the Proposed Removal record.*

71. On April 10, 2015, Plaintiff submitted her written response to the Proposed Removal.

72. On April 15, 2015, Plaintiff and her counsel provided the oral reply to the Proposed Removal. Defendant sent a written summary of the oral reply to Plaintiff shortly thereafter.  Plaintiff submitted her revisions to the summary on April 30, 2015.

73. On May 6, 2015, Defendant emailed Plaintiff's counsel additional information and documents that Graham provided in support of the Proposed Removal.

74. Plaintiff, via counsel, submitted a written response to the supplemental information on May 15, 2015.

### *Defendant unlawfully removed Plaintiff based on performance during her detail.*

75. On June 29, 2015, Susarla issued the Notice of Decision to Remove, removing Plaintiff for unsuccessful performance in Critical Elements 1, 4, 5, and 6.

76. Pursuant to 5 U.S.C. § 4303, a federal agency may remove an employee for unsuccessful performance.  However, the agency must prove that the employee failed to perform in her ***position of record***.

77. On appeal to the MSPB, Plaintiff argued, among other things, that Defendant unlawfully removed her for alleged unsuccessful performance *in a detail*.

78. There is no dispute that Plaintiff was put on a PIP and removed based on her performance during her *detail to ECM*.

79. However, her *position of record* was an IT Specialist in *Department Offices*, not in ECM.  In fact, Defendant issued a Standard Form 50 indicating that Plaintiff had been removed from her employment with *"Departmental Offices"* on June 29, 2015.

80. The MSPB AJ rejected Plaintiff's argument, concluding that "Her position was organizationally realigned but her duties and responsibilities did not change."  The AJ further stated that any "differences between her FY 2013 and FY 2014 performance plans were not unique to her but applied to all IT specialists on the ECM team and were due to changes in technology and software applications that affected the nature of the work they do."

81. However, as is relevant here, any differences between Plaintiff's performance plan in her ECM detail and the performance plans for other ECM employees are immaterial.  What matters is whether Plaintiff's performance plan in her ECM detail was different from her performance plan in her position of record in DO.

82. The AJ's decision was wrong because Plaintiff's duties in her DO performance plan were completely different from the duties she performed on her detail to ECM.

83. Pursuant to 7 U.S.C. § 7701, Plaintiff is entitled to reinstatement, lost wages and benefits, and attorney's fees.

## COUNT 1

### (Title VII – National Origin Discrimination – Disparate Treatment)

84. Plaintiff repeats and realleges paragraph 1–83, above, as if fully set forth herein.

85. Defendant terminated Plaintiff's employment because of Plaintiff's national origin.

86. By and through its conduct, Defendant violated Title VII.

87. As a result of Defendant's unlawful actions, Plaintiff suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, and pain and suffering.

## COUNT 2

### (Title VII – National Origin Discrimination – Hostile Work Environment)

88. Plaintiff repeats and realleges paragraph 1–87, above, as if fully set forth herein.

89. As described in paragraphs 25–42 and 50–74, above, Defendant subjected Plaintiff to a hostile work environment because of her national origin.

90. By and through its conduct, Defendant violated Title VII.

91. As a result of Defendant's unlawful actions, Plaintiff suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, and pain and suffering.

## COUNT 3

### (Title VII – Race Discrimination – Disparate Treatment)

92. Plaintiff repeats and realleges paragraph 1–91, above, as if fully set forth herein.

93. Defendant terminated Plaintiff's employment because of Plaintiff's race.

94. By and through its conduct, Defendant violated Title VII.

95. As a result of Defendant's unlawful actions, Plaintiff suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, and pain and suffering.

## COUNT 4

### (Title VII – Race Discrimination – Hostile Work Environment)

96. Plaintiff repeats and realleges paragraph 1–95, above, as if fully set forth herein.

97. As described in paragraphs 25–42 and 50–74, above, Defendant subjected Plaintiff to a hostile

work environment because of her race.

98. By and through its conduct, Defendant violated Title VII.

99. As a result of Defendant's unlawful actions, Plaintiff suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, and pain and suffering.

## COUNT 5

### (Title VII – Retaliation)

100. Plaintiff repeats and realleges paragraph 1–99, above, as if fully set forth herein.

101. Defendant terminated Plaintiff's employment because Plaintiff engaged in activity protected by Title VII.

102. By and through its conduct, Defendant violated Title VII.

103. As a result of Defendant's unlawful actions, Plaintiff suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, and pain and suffering.

## COUNT 6

### (ADEA – Age Discrimination – Disparate Treatment)

104. Plaintiff repeats and realleges paragraph 1–103, above, as if fully set forth herein.

105. Defendant terminated Plaintiff's employment because of Plaintiff's age.

106. By and through its conduct, Defendant violated the ADEA.

107. As a result of Defendant's unlawful actions, Plaintiff suffered damages, including but not limited to lost wages and benefits.

## COUNT 7

### (ADEA – Age Discrimination – Hostile Work Environment)

108. Plaintiff repeats and realleges paragraph 1–107, above, as if fully set forth herein.

109. As described in paragraphs 25–42 and 50–74, above, Defendant subjected Plaintiff to a hostile

work environment because of her age.

110. By and through its conduct, Defendant violated the ADEA.

111. As a result of Defendant's unlawful actions, Plaintiff suffered damages, including but not limited to lost wages and benefits.

## COUNT 8

### (ADEA – Retaliation)

112. Plaintiff repeats and realleges paragraph 1–111, above, as if fully set forth herein.

113. Defendant terminated Plaintiff's employment because Plaintiff engaged in activity protected by the ADEA.

114. By and through its conduct, Defendant violated the ADEA.

115. As a result of Defendant's unlawful actions, Plaintiff suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, and pain and suffering.

## COUNT 9

### (5 U.S.C. § 4303 – Wrongful Termination)

116. Plaintiff repeats and realleges paragraph 1–115, above, as if fully set forth herein.

117. Defendant terminated Plaintiff's employment for alleged unsuccessful performance in a detail, rather than in her position of record.

118. By and through its conduct, Defendant violated 5 U.S.C. § 4303.

119. As a result of Defendant's unlawful actions, Plaintiff suffered damages, including but not limited to lost wages and benefits, mental anguish, emotional distress, and pain and suffering.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all Counts.

WHEREFORE, Plaintiff demands judgment against Defendant on all Counts and requests that the Court order Defendant to reinstate Plaintiff to her employment, and award Plaintiff back pay, front pay, and lost benefits; compensatory damages, in an amount to be determined by the jury, for pain and suffering, mental anguish, and emotional distress on Counts 1 through 5; interest; costs; the amount of tax on any award; reasonable attorney's fees; and any such other relief as the Court deems fair and just.

Date: September 8, 2017                          RESPECTFULLY SUBMITTED,

                                                 Alan Lescht and Associates, P.C.

                                                 By:    /s/

                                                 Alan Lescht, Esq. [DC Bar 441691]
                                                 1050 17th Street, NW, Suite 400
                                                 Washington, DC 20036
                                                 Tel:  (202) 463-6036
                                                 Fax:  (202) 463-6067
                                                 alan.lescht@leschtlaw.com
                                                 *Counsel for Plaintiff*